Filed 5/28/15  P. v. Ettima CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSEPH ELIJA ETTIMA,<br><br>    Defendant and Appellant. | G049814<br><br>(Super. Ct. No. 09ZF0074)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Francisco P. Briseno and Patrick Donahue, Judges.  Affirmed.

David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Kristine A. Gutierrez, and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

Joseph Elija Ettima appeals from a judgment after a jury convicted him of second degree murder, arson of an inhabited dwelling with an accelerant, and two counts of child abuse. Ettima argues the following: (1) there is insufficient evidence to support the jury's verdict he was competent to stand trial; (2) there is insufficient evidence to support his child abuse convictions; and (3) the trial court erred in instructing the jury with CALCRIM No. 3450 on insanity. None of his contentions have merit, and we affirm the judgment.

FACTS

The facts are not much in dispute. In January 2009, after his release from prison, 26-year-old Ettima went to his grandmother's, Emma Louise Hardwick-Street's (Hardwick), apartment in Los Alamitos. After Hardwick refused Ettima's request to live with her because she cared for Ettima's eight-year-old brother, Matthew W., and three-year-old cousin, Georgia E., Ettima stabbed her to death while the children were home. Later in the day, Ettima set the apartment on fire and left with the children. Ettima then abandoned the children, leaving them to fend for themselves. Emergency personnel responded and found Hardwick's charred remains.

In February 2010, a second amended indictment charged Ettima with the following: murder (Pen. Code, § 187, subd. (a); all further statutory references are to the Penal Code, unless otherwise indicated) (count 1); arson of an inhabited dwelling (§ 451, subd. (b)); two counts of child abuse (§ 273a, subd. (a)) (counts 3 & 4); and making a criminal threat (§ 422) (count 5). The information alleged he committed count 2 with an accelerant (§ 451.1, subd. (a)(5)). The information also alleged he suffered four prior prison terms (§ 667.5, subd. (b)). Ettima pleaded not guilty.

Over the next two years, the trial court held numerous pretrial hearings, set trial dates, vacated trial dates, and granted defense continuances. In December 2011, defense counsel notified the court Ettima would change his plea to not guilty by reason of insanity. At a hearing that month, defense counsel doubted whether Ettima was

2

competent to stand trial. The court suspended criminal proceedings and ordered competency proceedings pursuant to section 1368. The court appointed Dr. Roberto Flores de Apodaca[1] at the prosecutor's request and Dr. Rose Pitt at the defense's request. Flores and Pitt filed their reports, both concluding Ettima was competent to stand trial. At a bench trial, Commissioner Vickie Lynn Hix reviewed the reports, concluded Ettima was competent to stand trial, and reinstated criminal proceedings. Ettima later pleaded not guilty by reason of insanity, and the case was assigned to Judge Francisco P. Briseno.

Pursuant to section 1026, the trial court appointed Dr. Laura A. Brodie and Dr. Ted R. Greenzang to examine Ettima. Both doctors filed reports indicating Ettima refused to be interviewed and did not want to plead not guilty by reason of insanity.

Trial began in September 2013, and jury selection spanned several days. Late one evening, Ettima flooded his cell and when deputies entered, Ettima injured himself. He was not taken to court the next day, the second straight day he was absent.

The trial court conducted a hearing over several days on why Ettima was absent. Several deputies testified and videos were played for the trial court. The court ruled Ettima's future absences would be ruled willful and intentional and considered a waiver of appearance for that day. The court also ruled Ettima would be restrained. Defense counsel again doubted whether Ettima was competent to stand trial. A hearing on Ettima's competence spanned several days. In addition to the psychological evidence regarding why Ettima was absent from trial, the court heard testimony from Flores, Pitt, and a psychiatrist who treated Ettima in jail. The court doubted Ettima's competence to stand trial, suspended criminal proceedings, and ordered competency proceedings pursuant to section 1368. The court reappointed Flores and Pitt.

---

[1]        For convenience, we refer to Dr. Roberto Flores de Apodaca as Flores.

*I. Competency Hearing*

The jury trial on Ettima's competence began in November 2013.

*Defense Case*

Flores, a psychologist and forensic evaluator, testified on direct examination the trial court appointed him to evaluate Ettima in December 2011. Flores interviewed Ettima at the Orange County Jail on May 9, 2012, and submitted a report that day. Flores interviewed Ettima a second time on October 30, 2013, and submitted a supplemental report on November 11, 2013. For the second evaluation, Flores reviewed an additional 5,000 pages of records. Flores stated the DSM-V is the official manual of mental disorders, including personality disorders, compiled by the American Psychiatric Association. He explained a personality disorder, of which there are 10 in the DSM-V, is a pervasive, inflexible personality trait that interferes with a person's functioning such as job performance, relationships, feelings, or health. Flores concluded after both evaluations that Ettima had a personality disorder, not otherwise specified, with borderline and antisocial features but that he did not have a mental disorder and was not psychotic. Flores opined Ettima's requests for help or medication were for manipulative reasons and not because he was genuinely bothered or distressed by his symptoms.

Flores stated that during the first interview, Flores asked Ettima about 60 questions to determine whether he understood the nature of the proceedings, and he answered the questions appropriately. During the second interview, Flores said Ettima was cooperative and gave appropriate answers. Flores added, however, that during the second interview, Ettima claimed he had a "tracker" in his brain that allowed other people to hear his thoughts, but it would not interfere with his ability to understand the court or communicate with counsel. Flores found Ettima's claimed delusion suspicious because the records indicated he had previously reported auditory hallucinations but rarely said anything about mind control. He explained Ettima demonstrated the ability to choose the behavior he wanted to display, which showed he had the power of choice. He

4

said Ettima cooperated with some examiners but not others. Flores stated a person with or without a mental illness can decline to cooperate with, or be a challenge to, his lawyer. He said that to be incompetent, the person must have such a break with reality as to be unable to assist in his defense. Flores concluded Ettima was able to assist counsel in a rational manner.

During cross-examination, Flores noted that although Ettima had a history of hospital commitments and multiple diagnoses dating back to when he was five years old, Flores's job was to render an opinion as to whether he was currently competent to stand trial. Based on his review of Ettima's mental history, including all the records and his interviews, Flores opined Ettima was competent to stand trial.

Flores noted the majority of those who examined Ettima described him as having an intact mental status, meaning he was oriented to person, place, and time. Flores said Ettima's memory was intact, he knew why he was at a particular placement, and his thoughts were linear, rational, and made sense. Flores explained records indicated several instances where Ettima admitted he caused events resulting in his hospitalization or in giving him medication. He added Ettima and others stated he purposely created an incident to obtain a particular placement or medication. Flores described such behavior as volitional, purposeful, and manipulative.

Flores stated that during the second interview, Ettima understood he was charged with murder, arson, and two counts of child abuse and he knew a felony was more serious than a misdemeanor. When Flores asked Ettima what sentence the judge would give him if the jury found him guilty, he said, "life," and where he would serve that sentence, he said, "in prison." Ettima told Flores a guilty verdict meant "life in prison" while a not guilty verdict meant, "be released from court, charges be dismissed, released in court." When Flores asked Ettima about his defense counsel, he said, "He's on my side. He speaks for me," and whether he had confidence in him, he said, "Hmm, little bit." Ettima told Flores that he did not completely trust and agree with the way

5

defense counsel was handling the case. Ettima stated the following: "We [the defense] want innocent, not guilty. She [the prosecutor] wants me to do the rest of my life in prison." Ettima stated he would prefer to be in a mental hospital rather than in prison. He told Flores that if he did not understand what a witness was saying, he would "[a]sk them to speak the question. Tell them me [*sic*] don't understand[,]" but if he spoke out in the courtroom, the "police probably jump on me."

Flores opined Ettima's records generally indicated he did not develop relationships with mental health or legal professionals based on trust, nor did he consistently take their advice. Flores said Ettima got along with professionals and participated in interviews selectively, when he chose to, but it was not because he was incapable. As to Pitt's opinion, Flores said Pitt allowed Ettima to control their interview and Pitt had an incentive to provide favorable testimony for Ettima. With regard to those doctors who diagnosed Ettima as schizoaffective, Flores opined it was because they could then prescribe medication that would make it easier to control Ettima. Flores opined doctors over diagnose and he had written on this topic.

Pitt, a clinical and forensic psychiatrist, opined Ettima was not competent to stand trial. Pitt testified the trial court appointed her to evaluate Ettima on June 5, 2012, and after interviewing Ettima and reviewing records, she concluded that at the time he was competent because his psychotic conditions were under control with medication, Risperdal (anti-psychotic), Depakote (mood stabilizer), and Benadryl (antihistamine). Pitt added she was concerned Ettima would decompensate if under stress.

Pitt explained that in September 2013, defense counsel requested she examine Ettima again because trial was set to begin. Pitt examined Ettima on September 24 and prepared a report on September 26. During the September 24, 2013, interview, Ettima gave Pitt background information, summarized the charges against him, and said he was competent to stand trial. Ettima said he was not psychotic and his attorney and the sheriff's deputies were trying to make him seem incompetent. He

6

claimed, incorrectly, his family was from Nigeria, they had important status there, and he was going there to become a minister in the Nigerian government. He also said that when he was arrested in Mexico for the current charges, the arresting authorities thought he attempted to escape so they put a chip in his head to track him. He claimed sheriff deputies used the chip to berate him into confessing. Pitt concluded Ettima believed what he was saying. By the end of the interview, Ettima spoke quickly and jumped from one topic to another.

Pitt testified the trial court reappointed her to evaluate Ettima on October 3, 2013. Pitt received approximately 4,000 pages of records and about 10 videos from the jail, but she was unable to speak with Ettima because he was in lockdown.

Pitt testified concerning Ettima's mental health history based on her review of his records as follows: (1) Ettima had an extensive mental health history that started at the unusually young age of five years old; (2) In 1991, a treating professional thought Ettima, who was six or seven years old, was mildly retarded; (3) While Ettima was in the juvenile justice system, he did the following: ate items such as staples, bolts, ice packs, and cleaning fluids; banged his head on the walls; and showed suicidal and homicidal ideation; (4) Ettima was in three different mental health placements between May 21, 1998, and January 7, 1999. In each case, his discharge diagnosis included a psychotic disorder. His condition improved when he took Risperdal; (5) Department of Corrections and Rehabilitation (CDC) records stated Ettima had borderline intellectual functioning, a severe mental disorder, and a low IQ; (6) Once Ettima was in the adult correctional system, he always ended up in a psychiatric unit; (7) Ettima demonstrated he had no awareness of his disorder because he always gave a rational explanation for his behavior, denied being ill, and lacked insight; (8) In September 2005, Ettima's doctors suspected he had delusions and auditory hallucinations, diagnosed him with schizoaffective disorder, and petitioned for him to be involuntarily medicated. His speech was disorganized and he was volatile, once lighting a mattress on fire in his cell. For the next three years, he

7

was involuntarily medicated with Risperdal.  Thereafter, Ettima showed improvement; and (9) Doctors most commonly diagnosed Ettima with schizoaffective disorder, meaning he had psychotic symptoms and manic-depressive episodes.

Pitt did not believe Ettima only had a personality disorder because records showed periods where he was acutely psychotic (every hospital's discharge diagnosis included a psychiatric disorder), and when he took Risperdal, his symptoms improved.  In reaching her opinion Ettima was not competent to stand trial, Pitt agreed with Flores that Ettima understood the court process, but she felt he could not cooperate with his attorney.  She stated Ettima had difficulty articulating what happened at the time of the crimes, he believed the prosecution had no evidence and he would be exonerated, and he was obsessed with the idea deputies were trying to make him confess.  Pitt said Ettima would not take medication because he feared being poisoned or sustaining brain damage.  Pitt explained that because he was not taking his medication, Ettima could not make rational decisions about whether to meet with doctors in preparation for a possible not guilty by reason of insanity (NGI) plea, attend court proceedings, or testify at trial.  She concluded Ettima needed to be in a psychiatric hospital where he would receive constant supervision and treatment.

*Prosecution Case*

Dr. Pete Farrell, the psychiatric director of the Orange County Jail, testified the jail had a section devoted to inmates under psychiatric care and Mod L had cells that house inmates who needed to be kept safe.  Farrell worked in the area that includes Mod L.  Farrell stated doctors could force an inmate to take medication if the inmate was out of control, gravely disabled (a break from reality), or a danger to himself or others.  Farrell began treating Ettima in 2012, and continued him on the three medications he was taking:  Risperdal, Depakote, and Benadryl.  Farrell said it was important for a person taking medications to follow the prescribed regiment and Ettima was consistent until the end of August 2013.  He added though that by the end of September of that year, Ettima

8

had voluntarily cut his dosage by more than half and he subsequently had a number of incidents, incidents that coincided with scheduled court appearances. Farrell stated Ettima cut himself, flooded his cell, had razor blades in his possession, threw a substance at a deputy, had a sheet hanging in his cell, broke off a piece of a food tray and kept it, and tied a plastic instrument around his wrist. He explained that although some of these incidents resulted in Ettima's placement in Mod L, he was never declared gravely disabled and was always cleared to attend court. Farrell said Ettima stopped taking Risperdal by October 2, 2013. He believed Ettima took Risperdal for mood problems. It was Farrell's experience that Ettima would get moody, take drugs to stabilize his moods, and return to the main jail population, where he would spend significant amounts of time. Farrell stated Ettima displayed intense anger, and was volatile and manipulative. He added that Ettima recently refused medication more frequently.

Luci Johnson, a courthouse deputy, testified she was familiar with Ettima, who had been coming to court since 2009, and he always complied with her. He freely complied with her requests to search him, he communicated properly, he was pleasant and polite, and he asked about her day. Johnson had been present when Ettima caused problems for other deputies. Johnson frequently intervened and gave Ettima a command. She said Ettima always apologized for his actions and obeyed her directions, although she did not speak in a different tone of voice from the other deputies and her words were the same. Ettima never mentioned a microchip or tracking device and never claimed deputies could see or hear his thoughts. She stated his conversations were always directed to the particular subject matter at hand.

Binh Trinh, a courthouse deputy, testified that as jury selection for the competency phase was underway, an African-American woman entered the courtroom and sat in the back. Trinh stated Ettima continuously turned around and looked at her. He said Ettima was agitated and angry, and the prosecutor escorted her out of the courtroom. Trinh explained Ettima told defense counsel he wanted to speak with his

9

mother, he was going to stay in his chair until he spoke with her, and if he was not allowed to do so, there would be consequences. Trinh saw him glare at defense counsel, crumple papers, and reach for a pen. Due to safety concerns, Trinh tackled Ettima and tried to restrain him, but he resisted, and other deputies arrived and restrained him. Trinh said when they got Ettima under control, he was cooperative and did not say anything.

Sergeant Dennis Carpio testified that about 45 minutes later he spoke to Ettima, who was agitated, in the holding area of the building. When Carpio asked Ettima what happened, he said his mother walked into the courtroom, he asked to speak with her but was told he could not do so without the judge's permission, and one of the prosecutor's talked to her. Ettima told Carpio he wanted his attorney there because the prosecutors were not working for him and his attorney refused, saying "his mother didn't have shit to add." Ettima got angry because his attorney was not assisting him and disrespected his mother. He said, "nobody disrespects his mother, and . . . when somebody disrespect[s] his mother, it's on." Ettima said he challenged the deputies to fight, got up, and they fought. Carpio testified they talked for 10 to 15 minutes but Ettima did not mention chips in his head or anything else out of the ordinary. Carpio said deputies advised inmates in advance they cannot communicate with audience members.

Sergeant Michael Pixomatis testified concerning an incident in May 2010, when Ettima created a disturbance in the jail that lasted over two hours. Ettima refused to return to his cell from the day room. He tied broken broomsticks around his arms and a torn bed sheet around his waist, poured water on the floor, and placed barricades in front of the door. He paced around the dayroom, swung a stick, and refused to cooperate with deputies. After the emergency response team threw in a sting ball, Ettima picked up the unexploded ball and tossed it at a window. Ettima finally complied when a large rubber sting ball hit him on the leg. The jury watched a video of the incident. The jury also watched videos of other incidents where Ettima did not comply with jail personnel and/or refused to attend court.

10

*Defense Rebuttal Case*

The defense played another video of Ettima's noncompliance while in custody. Ettima testified on his own behalf. Ettima understood the trial concerned his competency, the jury would decide the issue, and he decided whether or not to take the stand. He knew defense counsel was his lawyer, they have known each other for years, and sometimes they agree and sometimes they did not. He knew the trial judge, the prosecutor, the court clerk, and the court reporter. He also understood the uniformed deputies worked for the Orange County Sheriff's Department. Ettima did not think he was mentally ill. Ettima explained that if the jury found him competent, he would "go back to [the] regular case[,]" but if the jury found him incompetent, he would get psychological treatment at the Orange County Jail—he would receive therapeutic help, real medication, and come back to court at some point. Ettima hoped that at that point, he "won't be catching all these new charges" and would be a lot better. Ettima did not care what verdict the jury reached. Ettima claimed a tracker was put in his head five years earlier while he was in another country and it had an effect on his psyche. Ettima did not believe he was narcissistic or lacked concern for others, but he did think he had some problems. He stated everyone has psychological defects, and if the jury declared him incompetent, it would help him because he would get treatment rather than sit in a cell. Ettima complained about his confinement, facing additional charges, and returning to court. The jury concluded Ettima was competent to stand trial.

## II. Trial

Trial began in front of Judge Patrick Donahue in January 2014.

*Prosecution Case*

In January 2009, Ettima's brother Daniel Ettima (Daniel) lived with Hardwick and the two children. Around 10:00 a.m. on the day of the incident, Daniel heard an argument between Ettima and Hardwick. Daniel left the apartment shortly thereafter.

11

About 5:30 p.m. the day of the incident, Officer Lorin Paholski received a call regarding a fire at an apartment complex. When Paholski arrived, he saw smoke coming from the upstairs window of Hardwick's apartment. A boy, who later identified himself as Matthew, talked to a neighbor nearby. Matthew cried. Paholski asked Matthew when he was last in the apartment, and Matthew said, "I was in there . . . I saw my brother caused it." Matthew identified his brother as Ettima. Paholski asked, "He caused what?" Matthew said, "The fire[,]" and stated Ettima covered a broom with a shirt. When Paholski asked Matthew if his grandmother was in the apartment, Matthew said she was in the bedroom under a blanket. Paholski asked him where Ettima went, and Matthew said he left. When asked if Ettima got angry at their grandmother, Matthew responded, "Yeah, . . . he killed her, he killed her[,]" and stated Ettima stabbed her with a knife. Matthew explained he heard his grandmother screaming, he went to see what happened, and he found her laying on the floor near the bathroom. When asked, Matthew said Ettima killed his grandmother that afternoon and he tried to call the police but he could not find a phone. He explained Ettima started the fire by putting a shirt on a broom and lighting it on fire, and his grandmother was on the floor with blood coming out of her. Matthew's backpack was booked into evidence.

Fire captain Jose Perez and other firefighters responded to the fire. When Perez went inside the apartment, he saw glasses and blood on the floor, blood on the doorjamb near the hall, and blood on the doorway to the bathroom area. After firefighters forced entry into the bedroom, they saw that most of the fire was just behind the door and closet. Perez saw a body, Hardwick, face up on the bed beneath some debris. There was clothing on fire around her, and she was burned from the chest up.

Battalion chief and arson investigator John Abel responded to the fire. When Abel entered the upstairs bedroom, he saw a couple broomsticks with clothing tied around them in a knot. The broomsticks were near the fire's point of origin, and the point of origin was close to the body. Abel determined the cause of the fire was arson. Abel's

12

observations were consistent with a scenario in which clothing was tied around the brooms, rubbing alcohol, an accelerant, was poured on the clothing, and a match was lit.

After 5:00 p.m. the day of the incident, Ettima called his friend Wilfredo Ortega. Ettima calmly asked Ortega if he could give Ettima a ride to a hotel because he needed a place to stay. After Ortega picked up Ettima at a community college in Los Angeles they both attended, Ortega took him to a hotel, registered for a room under his name, paid for the room, and left. A couple hours later, Ettima called Ortega and asked if he had a sweater he could borrow. Ettima called Ortega a few more times that night and during one of the calls nervously asked Ortega to pick him up. Ortega was upset because he paid for the room, but Ettima insisted on leaving. Ortega picked up Ettima and others. At some point, Ettima threw away the sweater. Ortega took Ettima to Tijuana, Ettima thanked him for the ride, and Ortega never saw Ettima again.

Based on information from Ortega, Officer David Barr found a bloody sweatshirt in a trash dumpster in Los Angeles. DNA testing later revealed the blood was consistent with Hardwick's and Ettima's blood.

Adrianna Ball, a social worker with the Child Abuse Services Team (CAST), interviewed Matthew the day after the incident. Matthew told Ball the following. Matthew woke up and went downstairs, he heard screaming so he went back upstairs, and he saw Hardwick, who had blood coming out of her mouth. Matthew saw Ettima stabbing her with a knife, and Ettima told him to go downstairs. Ettima told Matthew that he killed Hardwick because Matthew "couldn't be free enough." Ettima dragged Hardwick to her room and put a blanket, a blanket Matthew received as a Christmas present, over Hardwick's body. Ettima told Matthew to light a match and put it on a broom, threatening to kill Matthew and Georgia if Matthew did not comply. The broom caught fire. Ettima told Matthew the next time Matthew saw him, Ettima was going to hurt him, and Matthew ran to a friend's house. Matthew said Ettima stabbed his grandmother during the day, but they started the fire at sunset. Ettima, Matthew, and

13

Georgia were home, and Georgia was upstairs. When Ettima stabbed Hardwick, they were in the hallway, and blood went into the bathroom. Ettima poured alcohol in the kitchen and bathroom before starting the fire.

When Ball asked him to repeat the timeline, Matthew said he woke up, went downstairs to get cereal, and watched television. When he heard his grandmother scream, he went back upstairs and heard Ettima, who was standing in the hallway, arguing with their grandmother, who was in her room sitting down. Matthew went downstairs and heard screaming, causing him to drop the cereal bowl, which broke. Matthew yelled outside to the gardener that Ettima was trying to kill his grandmother, but the gardener did not understand him. Ettima came downstairs holding a bloody kitchen knife. He wore a white jacket covered with blood. He took off the white jacket and put on a green jacket. Ettima said he would be in handcuffs the next time Matthew saw him.

Matthew told Ball that after the argument, Hardwick came out of her room, and he went downstairs. When he heard screaming, he went upstairs and saw blood coming out of Hardwick. She was lying on the ground with her head in the bathroom doorway and her feet in the hall. Ettima dragged her body into her room. Ettima walked downstairs with a bloody kitchen knife. When Georgia woke up and started crying, Ettima aimed the kitchen knife like he was about to stab Georgia. Matthew tried to get the knife away from Ettima, and Matthew accidentally got cut. After Ettima put Hardwick on the bed, he covered her with a blanket and put one broom on top of her and another on the bed. He taped clothing to the brooms with bandage tape, and he made Matthew light the brooms on fire.

Matthew explained, "he made me set it on fire and then throw it in grandma's room." Ettima threatened to kill Matthew and Georgia if Matthew disobeyed him. Matthew said, "he told me to throw it in, but when, I almost got burned by it." Georgia was downstairs asleep at the time. After the fire started, Ettima, Matthew, and Georgia left the house. When Ball asked Matthew what Ettima did with the knife,

14

Matthew said he cleaned it and put it in the drawer with the other knives. Matthew said Georgia was shocked when she stood and watched Ettima stab their grandmother. When they started the fire though, Georgia was asleep downstairs. Ettima gave Matthew matches and asked him to set a broom on fire. When Matthew tried to ignite the first broom nothing happened, but when he dropped the match a fire started because Ettima had put rubbing alcohol on the ground before the fire "and then the fire was right on top of us." Ball asked Matthew if Ettima put the alcohol on his grandmother's body. Matthew said, "Yup, and then the whole, I thought the whole house caught on fire, but my brother, I just wanna, I just wanna say to him, he's an idiot 'cause [sic] he took the keys, if I had the keys I would give it to the firefighter to get in there real quick." When asked about the keys, Matthew said Ettima used them to lock both the front door and the security door behind them.

Ball asked Matthew when it was that Ettima threatened to stab Georgia. Matthew said it was after the fire before they left the apartment. Georgia was sleeping on the sofa but woke up and started crying. When Matthew tried to stop Ettima, the knife fell and Matthew accidentally got cut. Ettima quickly got a bag, put some items in it, and left without saying where he was going. Ettima told Matthew, "I'm running out of time, I gotta get out of here, . . . you're so innocent, you're just so freaking innocent." Ettima walked to the bus stop, abandoning Matthew and Georgia. Matthew stated that while they were in the house, Ettima gave him some mints, a paper towel, a tissue, cough drops, and money, which he took from Hardwick, along with her cell phone. When Ball asked Matthew what Ettima said while he was stabbing Hardwick, Matthew said Ettima wanted him to be "free" and "have some fun."

When Ball asked Matthew what was the first thing he saw when he went upstairs, Matthew said he saw Ettima punching Hardwick very hard and heard screaming. When he went downstairs, he heard more screaming and went upstairs a second time. Ettima was sitting next to Hardwick with a knife, and blood was coming out of her chest.

15

Ettima dragged her into her bedroom, got a blanket from Matthew's room, and covered her. Ettima told Matthew to find tape while he found two brooms and clothing. Ettima taped the clothes to one broom, and he directed Matthew to tape clothes to the other. Upstairs, Ettima told Matthew to light the broom he was holding on fire and throw it into the room. Ettima removed the batteries from the house telephone and unhooked it. The smoke alarm woke up Georgia, who was asleep downstairs, and that was when Ettima retrieved a kitchen knife and threatened her.

When Ball asked him what happened between the stabbing and the fire, Matthew responded Ettima gave him some food and they prepared the brooms. Georgia came down at the same time, and they both began to cry. Ball asked Matthew if Georgia fell asleep on the couch, and Matthew said she fell asleep after Ettima gave her sleeping pills. Ettima told Matthew to get water and give Georgia the pills. However, Ettima was the one who poured the alcohol. Matthew said the pills were the pills his brother used to fall asleep.

Dr. Anthony Juguilon, chief forensic pathologist for the Orange County Sheriff's Department, performed an autopsy on Hardwick. She had been stabbed 15 times, three of which alone were fatal, and most of the body was extremely burned. Juguilon opined Hardwick sustained all the injuries about the same time and would lead to death within minutes. Juguilon opined she was dead when her body was burned, the cause of death was multiple stab wounds, and the manner of death was homicide.

Three months later, agent Austin Phillips of the United States Marshal's Service was at the Mexico City International Airport to transport Ettima back to the United States. When Ettima physically assaulted a Mexican immigration official, Phillips subdued Ettima. Phillips subsequently transported Ettima to the United States without further incident.

Matthew testified Ettima stabbed Hardwick with a knife. Matthew explained he was downstairs with Georgia when he heard his grandmother screaming.

16

When Matthew went upstairs to check on her, he saw Ettima on top of Hardwick, stabbing her. Ettima told Matthew to help him tie clothing to a broom, and Ettima set a broom on fire. Matthew did not want to help, but Ettima said something, which Matthew could not remember, that frightened him. Ettima used a match to light the brooms and threw them into Hardwick's bedroom and onto her bed. Matthew tried to call someone but could not because Ettima broke the phone. Ettima closed or locked the apartment door. When they left the apartment, Matthew took a blue backpack filled with tennis racket handles, his piggy bank, a roll of toilet paper, shoes, blue jeans, and an alarm clock. Matthew went to a friend's house and told the friend what happened.

*Defense Case*

The defense introduced Matthew's November 9, 2009, preliminary hearing testimony to show inconsistencies between that testimony and Matthew's statements to Ball and during trial. The defense also offered the testimony of two neighbors to establish Ettima tried to find someone to babysit Matthew and Georgia that afternoon.

*Jury Verdicts*

The jury convicted Ettima of count 1, second degree murder, and counts 2, 3, and 4. The jury found true Ettima used an accelerant to commit count 2. The jury acquitted him of count 5, making a criminal threat against Matthew.

*III. Sanity Phase*

The sanity phase began in front of Judge Donahue in January 2014.

*Defense Case*

Dr. Nancy Kaser-Boyd, a clinical and forensic psychologist, testified the defense retained her to examine Ettima and she reviewed about 3,000 pages of records spanning 29 years. Kaser-Boyd testified concerning Ettima's personal and mental health history. Ettima was abused and neglected as a young child. From 1988 to 1991, several mental health professionals diagnosed Ettima, who was five to eight years old, consistent with a psychotic disorder. One of the professionals concluded Ettima may be

17

schizophrenic and suggested psychotropic medication. The Los Angeles County Department of Social Services requested he be treated in a psychiatric ward. From 1991 to 1992, Ettima was placed in a residential treatment center for disturbed children. While there, he had nightmares about his mother beating him, people being dismembered or blown up, and voices telling him to be bad. Kaser-Boyd explained these records indicated Ettima's psychotic conditions had a very early onset.

Kaser-Boyd stated Ettima's bizarre behavior continued when he entered the juvenile justice system. He could not control his emotions and ate staples, bolts, an ice pack, and cleaning fluids. He spent time in three different psychiatric facilities, each time being diagnosed with a psychotic disorder and one time with a mood disorder. Staff observed Ettima was paranoid, had bizarre and disorganized behavior, suffered from auditory hallucinations, and responded to internal stimuli. When he was prescribed with Risperdal, his condition improved.

Kaser-Boyd stated Ettima was transferred to the adult correctional system in August 2000 and moved to a psychiatric ward in May 2001. While in prison he spent time in inpatient housing and at state hospitals. When he was discharged from Atascadero State Hospital, he was diagnosed with bipolar disorder with psychotic features. However, the most common diagnoses was schizoaffective disorder. During that time, Ettima's receptivity to treatment was erratic, and he lacked insight and was defensive about having a mental disorder. From 2005 to 2008, he was involuntarily medicated with antipsychotics because he had delusions, suspected auditory hallucinations, disorganized thought and speech, and manic episodes. In September 2005, he lit a mattress on fire in his cell. The psychiatrist described Ettima as agitated, fearful, disorganized, and incoherent, and concluded he lacked capacity to give informed consent to medication. Ettima improved when he took medication. After he was released in September 2008, he stopped taking medication because he did not see the need for continued treatment and he committed the charged offenses about four months later.

18

Kaser-Boyd interviewed Ettima three times; twice for four hours and once for three hours. The first two times, he smiled and was polite, but he did not always answer her questions and had difficulty focusing. Ettima stated he descended from Nigerian royalty, inherited a lot of money, and would go back to Nigeria and become a member of the Nigerian Congress. Kaser-Boyd said Ettima's father died when he was nine and these fantasies were his way of coping with his father's death. Ettima devalued his mother's side of the family, stating his mother was abusive and uncaring. He also said there was a microchip planted in his head. During the third visit, she told Ettima that she was there with regard to a possible not guilty by reason of insanity plea. Ettima became angry and told her that he was not insane and did not want an insanity defense.

Kaser-Boyd explained that after three visits, her observations were "to some extent," consistent with a diagnosis of schizoaffective disorder. Based on her review of the records and her observations of Ettima, Kaser-Boyd opined that on the date of the offenses, Ettima had a mental disease, schizoaffective disorder, which is a chronic illness. Kaser-Boyd explained that Ettima's conduct of putting items in a backpack and trying to deliver the children to a safe place is consistent with a thought disorder. She added it was unrealistic to believe a person could give a child items that would not sustain the child and leave that child with a stranger. Additionally, Ettima showed up in Los Angeles with no money, food, or bags, demonstrating he was disorganized and unprepared. Based on these facts, Kaser-Boyd opined there was a strong likelihood that during the crimes, Ettima did not appreciate that what he was doing was wrong.

*Prosecution Case*

Daniel testified Ettima, who stood in the hallway, and Hardwick, who stood in her room, argued with raised voices for about five minutes. Daniel said Hardwick told Ettima that she did not take care of grown men. Daniel said the argument was over by the time he left.

19

Detective Christopher Karrer, the lead investigator, spoke with Ettima at the police station in April 2009 after he returned from Mexico. Karrer had Ettima look at photographs of family members, including Hardwick and Matthew. Karrer first asked Ettima if he knew Matthew and Hardwick and he said, "No." When Karrer showed him photographs of Matthew and Hardwick and asked again, he laughed or smiled and nodded in the affirmative. Karrer asked him if he knew anything about the fire in Los Alamitos in January. Ettima said he knew nothing about the fire because he had been in Mexico for the past six months.

Dr. Veronica Thomas, a clinical and forensic psychologist, testified the prosecution hired her to evaluate Ettima's legal sanity. Thomas explained the question to be determined in a sanity proceeding was whether or not a person had a severe mental illness and whether, during the commission of the crime, the illness impaired his ability to comprehend the nature of his act or whether it was wrong. She said many individuals who were mentally ill were not legally insane and the vast majority of people in the criminal justice system made bad choices but were not mentally ill.

Thomas reviewed the charging documents, Matthew's CAST interview, the guilt phase testimony, Ettima's testimony at a prior proceeding, and around 4,000 pages of records. She did not interview Ettima and considered the fact he agreed to meet with Kaser-Boyd but would not talk to other doctors. Thomas testified regarding Ettima's mental health records. In 1988, Metropolitan State Hospital staff described Ettima as a liar, manipulative, and antisocial. In 1998, Ettima admitted he cut himself to get out of juvenile hall. Atascadero staff noted he was extremely sociopathic and manipulative. In 2002, Ettima said all his behavior problems were "a ploy to play the system so [he] could pick the program [he] like[d] most." He swallowed things to be taken to the hospital and hit a doctor to spend more time in an institution of his choosing.

Thomas stated Ettima's prior testimony he had psychological problems like everyone else showed insight on his part. She said he could be manipulative and lying

20

even if he was also schizoaffective. She added the records demonstrated he had a history of severe behavior impairments and cannot live with other people. Thomas stated Ettima had been diagnosed with fixed maladaptive ways of coping with life, an observation consistent with personality disorders, and since childhood, he had presented himself as idiosyncratic and with a diverse number of problems. Thomas explained a person can have both a schizoaffective disorder and a personality disorder; personality disorders cannot be diagnosed until the person is over age 18. She stated it was clear Ettima had a severe mood impairment but a person with such an impairment can function in society by being treated or taking medication. Thomas explained a borderline personality disorder with antisocial features means the person was unstable in mood, affect, and behavior, criminally minded, lacking in empathy, and engaging in criminal conduct. The reports suggested Ettima had both antisocial personality disorder and schizoaffective disorder. She said borderline personalities typically come from childhoods that were chaotic, neglectful, or abusive, which Ettima experienced. He grew up in an unstable environment characterized by neglect, and by emotional and physical abuse. She also stated borderline personalities use anger and unhappiness to achieve their goals. They are very manipulative and violent. She explained a personality disorder can have an effect on how a major mental disorder was demonstrated and a drug such as Risperdal helps a person suffering from both because it treated the psychosis and also acts as a sedative.

Thomas noted Ettima's mental health records for the most part describe him as having an intact mental status. She said that after his psychiatric hospitals stays, he was always returned to a normal environment, which suggested he is able to control himself and cope to a certain extent. She stated Ettima behaves himself when he wants to and his bad behavior in the hospital and in custody appeared directed at his desire to be in control because he does not like rules or authority figures. She said Ettima had a history of being angry and demonstrating that anger to achieve some benefit. On one occasion, he was suicidal so he could get medication. He claimed he took his medication to avoid

21

being involuntarily medicated. On another occasion, he said, "I play like I'm sick sometimes, then I play like I'm okay." Another time, he said, "I'm not suicidal. I was just saying that so I could talk to the sergeant." Thomas did not find Ettima's reported delusion of a chip in his head credible because he did not have a history of such delusions and because it was not uncommon for clients to report delusions after a crime to enhance the likelihood they might be seen as mentally ill.

Thomas stated Ettima's records indicated he was well spoken, he had no law violations in the four months before the crimes, and he attended trade school and got an "A" in self-defense. She said he developed relationships. She stated his conduct the day of the offenses established goal-oriented behavior. During the commission of the crimes, Ettima disabled the house telephone by removing the batteries, moved Hardwick's body and laid clothes on it, tied materials around the brooms to help light the fire, put accelerant in places he wanted to burn, and looked through Hardwick's wallet. After he set the fire, he locked the apartment doors, took the children to neighbors, and calmly and politely asked one of them to babysit. Later, he called Ortega and asked for help without alerting Ortega to what had happened, he boarded a bus and went to a place both he and Ortega knew, he went to a motel where no one would know to look for him, he had Ortega fill out the registration in Ortega's name, and he obtained new clothes from Ortega after disposing of his bloody clothes.

Thomas opined Ettima killed Hardwick because he believed her side of the family wronged him and had chosen the younger members of the family over him. She said Ettima was angry and focused that anger on his grandmother. When asked, she agreed Ettima knew the killing was wrong and the killing was a clear manifestation of his personality disorder. She stated he was trying to justify his actions when he said, "[I] want[] Matthew to be free." She testified there was no indication that during the crimes Ettima had lost touch with reality, was responding to internal stimuli, or believed external forces controlled him—he used a knife and aimed for the kill zone. She stated that no

22

one in contact with him during that time period noticed any hallucinations, delusions, or bizarre manifestations. To the contrary, she said Ettima made statements to Matthew indicating he knew he was wrong. For example, he told Matthew "I'm running out of time. I gotta get out of here." He also said, "Next time you see me, I will be like this" and indicated he would be in handcuffs. She said he fled to Mexico where he lived undetected for four months and tried to escape when marshals tried to bring him back. Thomas opined Ettima made a choice to act as he did. Thomas could not conclude Ettima satisfied the elements of legal insanity at the time of the charged offenses. In her opinion, Ettima was mentally ill but he was not legally insane.

On cross-examination, Thomas agreed when defense counsel asked whether Ettima's psychotic disorder was "due to a brain disease, a biological anatomical mishap or malfunction in the brain[.]" When asked whether the charged offenses were "a manifestation of the personality disorder driving the train along with the psychotic[,]" Thomas replied, "That is my opinion." Thomas agreed "the psychotic portions of his diagnosis are along for the ride[.]"

As relevant here, the trial court instructed the jury with CALCRIM No. 3450, "Insanity: Determination, Effect of Verdict." During closing argument the prosecutor conceded Ettima had a mental disease or defect. The prosecutor stated the issue was whether Ettima knew or understood the nature and quality of his acts or was incapable of understating or knowing his acts were morally or legally wrong. The jury concluded Ettima was sane at the time he committed the offenses.

IV. *Sentencing*

At a bifurcated bench trial, the trial court found true Ettima suffered three of the four prior prison terms. The court sentenced Ettima to a determinate term of 13 years as follows: count 2-upper term of eight years; count 2's section 451.1, subdivision (a)(5), enhancement-three years; and section 667.5, subdivision (b)'s prior prison terms-two one-year terms. The court sentenced him to 15 years to life on count 1.

23

The court ran the indeterminate term consecutive to the determinate term. The court imposed and stayed or struck the sentences on the other counts and enhancement.

DISCUSSION

Ettima contends: (1) there is insufficient evidence to support the jury's verdict he was competent to stand trial; (2) there is insufficient evidence to support his child abuse convictions; and (3) the trial court erred in instructing the jury with CALCRIM No. 3450 on insanity. We discuss each of these contentions separately.

*I. Competency Hearing-Sufficiency of the Evidence*

Ettima argues there was insufficient evidence to support the jury's verdict he was competent to stand trial. We disagree.

"A person cannot be tried or sentenced while mentally incompetent. (§ 1367, subd. (a).) A defendant is mentally incompetent to stand trial if, as a result of mental disorder or developmental disability, he or she is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner. (*Ibid*. . . . .) A defendant's trial while incompetent violates state law and federal due process guarantees. [Citations.] A defendant is presumed competent unless the contrary is proven by a preponderance of the evidence. (§ 1369, subd. (f); . . . .) On appeal, the reviewing court determines whether substantial evidence, viewed in the light most favorable to the verdict, supports the finding on competency. [Citation.] Evidence is substantial if it is reasonable, credible and of solid value. [Citation.]" (*People v. Dunkle* (2005) 36 Cal.4th 861, 885, overruled on other grounds in on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

The issue was whether Ettima proved by a preponderance of the evidence that he was unable to understand the nature of the proceedings or assist defense counsel in presenting a defense in a rational manner. In his reply brief, Ettima states, "Admittedly, there is no question evidence was presented by the People that [he] suffered no mental illness whatsoever[,]" and "[he] does not dispute . . . that evidence of

24

competency was presented, namely through the testimony of . . . Flores." Ettima invites this court to conclude that as a matter of law Flores's testimony was insufficient for a variety of reasons, including that Ettima had a 20-year history of mental illness dating back to when he was five years old and Flores, who believed mental health experts as a group over diagnose, was the only mental health expert to conclude Ettima suffered from a personality disorder.[2]  In other words, Ettima asks this court to ignore Flores's testimony because Flores was not credible and to rely on evidence favorable to Ettima to conclude he was not competent to stand trial.  That we cannot do because Flores, a witness who Ettima called to testify and does not dispute was qualified to offer an expert opinion (Evid. Code, § 720), and the prosecutor's witnesses both provided credible and solid evidence Ettima was competent to stand trial.

Although Pitt offered evidence Ettima was not competent to stand trial because his psychotic disorder prevented him from assisting defense counsel with presenting a defense in a rational manner, there was also testimony from numerous witnesses Ettima was competent to stand trial.  After interviewing Ettima twice and reviewing thousands of pages of mental health records, including those where a mental health professional concluded Ettima had a mental disorder, Flores opined Ettima had a personality disorder, not a mental disorder, and he was *at the time of the competency hearing* competent to stand trial.  Flores explained that although other mental health professionals concluded Ettima had a schizophrenic disorder, the majority of professionals concluded his mental status was "intact" or "okay" with no abnormalities. Flores stated that it was his opinion mental health professionals over diagnose in part to prescribe medication to better control the patient.

---

[2]      We note Ettima's counsel criticizes Flores for impugning Pitt's integrity (Pitt had an incentive to conclude Ettima was not competent) then subsequently impugns Flores's integrity (of course Flores testified according to his academic specialty).  The jury heard this evidence and counsels' arguments concerning their biases and could evaluate this evidence accordingly.

Based on his review and examination, Flores concluded Ettima requested help or medication to manipulate and he consciously chose when to be cooperative. Farrell's testimony additionally provided the jury with evidence Ettima's violent outbursts and self-destructive behavior coincided with his scheduled court dates in an attempt to manipulate the system. The jury could reasonably infer from Johnson's testimony Ettima complied with her orders but not other deputies' orders that Ettima chose when to cooperate. Ettima's outburst in court when he saw his mother and his subsequent statements to Carpio also indicate Ettima had the ability to keep himself in check, or not, depending on the circumstances. That Ettima was involuntarily medicated as recently as one year before the charged offenses did not mean he was unable to understand the proceedings or assist counsel with his defense at the time of trial.

Additionally, Flores stated Ettima's claim during their second interview about the chip in his head was suspicious because his primary complaint was auditory hallucinations not mind control. Ettima's statements during their second interview convinced Flores that Ettima was competent to stand trial. Ettima knew that if he was convicted of the felonies he was charged with he would be sentenced to life in prison. He also knew that if the jury found him not guilty he would be released. He understood the prosecutor wanted him to go to prison and defense counsel spoke for him. Ettima understood defense counsel was on his side, but Ettima did not completely agree with the manner in which he handled the case. Finally, Ettima understood he had to behave himself in the courtroom. Flores thus opined Ettima understood the nature of the proceedings and could assist his defense counsel in presenting a defense.

Finally, Ettima's primary assertion is he had a long history of mental illness and his mental disorder meant he was incompetent to stand trial. However, the California Supreme Court, in the context of whether a trial court in the first instance is required to conduct a competency hearing, has said otherwise. In *People v. Blair* (2005) 36 Cal.4th

26

686, 714 (*Blair*),[3] the court stated: "[E]ven a history of serious mental illness does not necessarily constitute substantial evidence of incompetence that would require a court to declare a doubt concerning a defendant's competence and to conduct a hearing on that issue. [Citation.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 847 [preexisting mental illness little relevance on issue whether defendant can assist his defense counsel]; *People v. Ramos* (2004) 34 Cal.4th 494, 508 [same].) Thus, there was sufficient evidence Ettima understood the proceedings and could assist counsel in presenting a defense and he was competent to stand trial.

## II. Guilt Phase

### A. Sufficiency of the Evidence-Counts 3 & 4

Relying on inconsistencies between Matthew's statements during his CAST interview, his grand jury testimony, and trial testimony, Ettima contends there is insufficient evidence to support his child abuse convictions. Not so.

""""To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt."' [Citations.] "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment."'' [Citations.] The standard of review is the same when the prosecution relies mainly on circumstantial evidence. [Citation.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 104.)

Felony child abuse, section 273a, subdivision (a), provides: "Any person who, under circumstances or conditions *likely to produce great bodily harm or death*, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical

---

[3] *Blair* was overruled on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919-920.

pain or mental suffering . . . shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years." (Italics added.)

Citing to the above italicized language, Ettima argues there was no evidence he placed Matthew or Georgia in a position where it was likely they would suffer great bodily harm or death. Not so.

In *People v. Sargent* (1999) 19 Cal.4th 1206, 1216 (*Sargent*), the California Supreme Court said the felony provision was "'intended to protect a child from an abusive situation in which the probability of serious injury [was] great.' [Citation.]" In *People v. Wilson* (2006) 138 Cal.App.4th 1197, 1204, the Fourth District, Division One, concluded this definition in *Sargent* was dictum and "the definition of 'likely' in the context of section 273a is not that the death or serious injury is probable or more likely than not." The *Wilson* court concluded, "'[L]ikely' as used in section 273a means a substantial danger, i.e., a serious and well-founded risk, of great bodily harm or death." (*Id.* at p. 1204.)

Even assuming "likely" means the probability of injury must be *great*, that higher standard is satisfied here. The evidence demonstrated Ettima set fire to the apartment while Matthew and Georgia were inside. After Ettima placed Hardwick's body on her bed and covered it, he taped clothes around brooms. He poured an accelerant throughout the house. He either lit, or had Matthew light, the brooms on fire with matches. During the CAST interview, Matthew told Ball "the fire was right on top of us." There was evidence that when Ettima and Matthew were upstairs, with the fire surrounding them, Georgia was downstairs asleep when the smoke detector sounded. One child, Matthew, was in the center of the fire, and another child, Georgia, was asleep only to be awoke because the smoke reached the detector. This evidence alone proves

28

Ettima created circumstances in which the probability of great bodily injury to the children was great.[4]

Although Ettima highlights the differences between Matthew's various statements, he does not seriously dispute his statements concerning the fire. That Ettima first tried to find a babysitter for the children and he made comments he was setting the children free does not persuade us otherwise. Like in *People v. Toney* (1999) 76 Cal.App.4th 618, 623, where the court upheld a conviction for section 273a where defendant's home contained dangerous and highly flammable chemicals used to manufacture methamphetamine, here Ettima's conduct of enlisting the help of Matthew to build a funeral pyre for their grandmother in her bedroom and spreading accelerant throughout the apartment while two children were in the apartment was certainly evidence the probability of serious injury or even death to Matthew and Georgia was great. Therefore, the evidence was sufficient to support Ettima's convictions for counts 3 and 4.

*B. Jury Instruction-CALCRIM No. 3450*

Ettima argues the trial court erred in instructing the jury with CALCRIM No. 3450 because a portion of it was legally erroneous and inapplicable to the facts of the case. Recognizing his trial counsel did not object to the instruction, Ettima contends he did not forfeit appellate review of the issue because it affected a substantial right (§ 1259). Because the Attorney General does not argue forfeiture, and to avoid the inevitable ineffective assistance of counsel claim (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 92), we address the merits of Ettima's claims below.

First though we provide the text of the instruction as provided to the jury. The trial court instructed the jury with CALCRIM No. 3450 as follows:

---

[4]  Ettima claims the prosecutor did not rely on this evidence to support counts 3 and 4. The prosecutor relied on the "continuous course of conduct" of which the fire was certainly a part.

29

"You have found the defendant guilty of murder, arson and child abuse. Now you must decide whether he was legally insane when he committed the crimes. [¶] The defendant must prove that it is more likely than not that he was legally insane when he committed the crimes. [¶] The defendant was legally insane if: [¶] l. When he committed the crimes, he had a mental disease or defect; [¶] AND [¶] 2. Because of that disease or defect, he was incapable of knowing or understanding the nature and quality of his act or was incapable of knowing or understanding that his act was morally or legally wrong. [¶] *None of the following qualify as a mental disease or defect for purposes of an insanity defense: personality disorder, adjustment disorder, seizure disorder, or an abnormality of personality or character made apparent only by a series of criminal or antisocial acts.* [¶] You may consider any evidence that the defendant had a mental disease or defect before the commission of the crimes. If you are satisfied that he had a mental disease or defect before he committed the crimes, you may conclude that he suffered from that same condition when he committed the crimes. You must still decide whether that mental disease or defect constitutes legal insanity. [¶] You may find that at times the defendant was legally sane and at other times was legally insane. You must determine whether he was legally insane when he committed the crime[s]. [¶] If you conclude that the defendant was legally sane at the time he committed the crimes, then it is no defense that [he] committed the crimes as a result of an uncontrollable or irresistible impulse. [¶] If, after considering all the evidence, all twelve of you conclude the defendant has proved that it is more likely than not that he was legally insane when he committed the crimes, you must return a verdict of not guilty by reason of insanity."

*1. Legal Claims*

Ettima argues the above italicized portion of CALCRIM No. 3450 was erroneous for the following reasons: (1) it precluded the jury from considering whether he was insane due to a personality disorder in combination with other factors in violation of former section 25.5; (2) it declares, as a matter of law, a personality disorder is not a

30

mental illness; (3) it fails to distinguish between personality disorders exhibited by antisocial conduct and personality disorders caused by mental illness; and (4) it improperly joins personality disorders with intoxication and addiction disorders in violation of former section 25.5. Beginning with Ettima's last claim, the trial court blacked out the language concerning intoxicants, and thus the jury could not improperly "align" personality disorders with intoxicant disorders.[5] This claim is meritless.

With respect to his first three claims, Ettima cites to former section 25.5 and CALJIC No. 4.00 to argue the language in question does not adequately explain a personality disorder *alone* does not render one insane thus precluding a jury from finding one insane based on a personality disorder *and* a psychotic disorder. In other words, Ettima claims the language renders the defense meaningless when a person has a personality disorder emanating from a psychotic disorder because it states unequivocally a personality disorder does not qualify as a mental illness. We disagree with his claims.

Section 25.5, renumbered section 29.8 without substantive change, stated: "In any criminal proceeding in which a plea of not guilty by reason of insanity is entered, this defense shall not be found by the trier of fact *solely* on the basis of a personality or adjustment disorder, a seizure disorder, or an addiction to, or abuse of, intoxicating substances." (Italics added.) CALJIC No. 4.00 provides: "[However, this defense of legal insanity does not apply when the *sole* or *only* basis or causative factor for the mental

---

[5] That language states: "[Special rules apply to an insanity defense involving drugs or alcohol. Addiction to or abuse of drugs or intoxicants, by itself, does not qualify as legal insanity. This is true even if the intoxicants cause organic brain damage or a settled mental disease or defect that lasts after the immediate effects of the intoxicants have worn off. Likewise, a temporary mental condition caused by the recent use of drugs or intoxicants is not legal insanity.] [¶] [If the defendant suffered from a settled mental disease or defect caused by the long-term use of drugs or intoxicants, that settled mental disease or defect combined with another mental disease or defect may qualify as legal insanity. A *settled mental disease or defect* is one that remains after the effect of the drugs or intoxicants has worn off.]"

31

disease or mental defect is [a personality or adjustment disorder] [a seizure disorder][, or] [an addiction to, or an abuse of, intoxicating substances].]" (Italics added.)

Although it is true the language in question does not include "solely" as found in section 25.5 (section 29.8), and CALJIC No. 4.00, we conclude the plain language did not preclude the jury from considering a schizoaffective disorder along with a personality disorder in deciding whether Ettima was insane at the time of the murder. When read in its entirety as we must (*People v. Huggins* (2006) 38 Cal.4th 175, 192 (*Huggins*) [instructions must be read in their entirety]), CALCRIM No. 3450 states the jury could conclude Ettima was legally insane if it found the following: at the time of the crime he had a mental disease or defect; because of that mental disease or defect he was incapable of knowing or understanding the nature and quality of his act or was incapable of knowing or understanding that his act was morally or legally wrong; and a personality disorder did not qualify as a mental disease or defect.

Based on a complete reading of the record, we think Ettima's complaint regarding the instruction misses the mark. As we explain below, there was some evidence from which the jury could have reasonably inferred Ettima suffered solely from a personality disorder, although there was also evidence he suffered from a personality disorder and a mental disease or defect, schizoaffective or psychotic disorder. During closing argument, the prosecutor conceded to the jury Ettima suffered from a mental disease or defect. The prosecutor argued the issue the jury had to decide was the second prong of the insanity test—his understanding and knowledge of his acts. Based on the evidence and the prosecutor's concession, it is reasonable to assume whether Ettima had a mental disease or defect was not at issue and thus, his complaint the language prevented the jury from properly considering his personality disorder vis-à-vis his mental disorder is unpersuasive.

32

The fact CALCRIM No. 3450 does not include "solely" as found in section 25.5 (section 29.8), and CALJIC No. 4.00, although the instruction may benefit from including it, does not render the instruction constitutionally infirm. (*Huggins, supra,* 38 Cal.4th at p. 192 ["'not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation'"].) Finally, the exclusion of personality disorders from the definition of insanity was within the Legislature's discretion. (See, e.g., *Clark v. Arizona* (2006) 548 U.S. 735, 750, fn. 11 ["[T]he jurisdictions limit, in varying degrees, which sorts of mental illness or defect can give rise to a successful insanity defense"].) Thus, it was not error for the trial court to instruct the jury with the language at issue.

2. *Sufficiency of the Evidence*

Ettima asserts the trial court erred in instructing the jury with the above italicized portion of CALCRIM No. 3450 because "it had no application to the facts of this case." Ettima claims that because he "did not rely solely (nor to any degree) on personality disorder" and the prosecutor did not rely on "personality disorder alone" the court erred in instructing the jury with this language.

The trial court must instruct on all material issues supported by substantial evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 154, 160.) Here, Ettima's expert at the sanity hearing, Kaser-Boyd, opined at the time of offenses, Ettima had a mental disease, schizoaffective disorder. The prosecutor's expert, Thomas, testified a person can have both a personality disorder and a schizoaffective disorder and "[her] review of the other doctors' reports suggest that that may be the case[]" with Ettima, and on cross-examination she indicated Ettima could have both. However, Thomas also recognized the reports indicated that a majority of the time mental health professionals described him as having intact mental status, meaning he had no abnormalities. Most importantly, when the prosecutor asked, Thomas agreed the killing was "a clear

33

manifestation of his personality disorder." Based on this evidence, the jury could reasonably infer Ettima suffered solely from a personality disorder.

Ettima's reliance on *People v. Robinson* (1999) 72 Cal.App.4th 421 (*Robinson*), is misplaced. In that case, the appellate court concluded the trial court should not have given a special instruction based on section 25.5 (the predecessor to section 29.8) because defendant did not present any evidence showing his alleged insanity arose solely from his ingestion of intoxicants and neither defendant nor the prosecutor relied on defendant's "long-term substance abuse and possible resulting mental damage or disorder as the sole cause of his insanity." (*Id*. at p. 423.)

Although neither defense counsel nor the prosecutor here relied on Ettima's personality disorder, the prosecutor did present evidence on the issue. As we explain above, Thomas agreed the killing was a "clear manifestation" of Ettima's personality disorder. Thus, the court properly instructed the jury with this language.

*3. Prejudice*

Assuming there was instructional error, Ettima was not prejudiced because there was not a reasonable probability that, absent the alleged error, the jury would have returned a verdict more favorable to the defendant. (*Robinson, supra,* 72 Cal.App.4th at p. 429.) At the sanity phase, the issue was whether Ettima was incapable of knowing or understanding the nature and quality of his act or was incapable of knowing or understanding his act was morally or legally wrong. There was strong evidence of both.

The evidence demonstrated Ettima's murder of his grandmother was not precipitated by a break with reality but instead by an argument after she told him that he could not live with her. The evidence established Ettima stabbed her 15 times in vital organs. After he unsuccessfully tried to find someone to watch the children, he covered her body in clothes, prepared the brooms, spread accelerant throughout the apartment, and started the fire. He called his friend to meet him at a place in Los Angeles where they were both familiar, and he had his friend register for a hotel room in the friend's

34

name.  Ettima disposed of his cell phone, cut ties with friends, and hid in Mexico for four months.  Based on all the evidence of planning, it was certainly reasonable for the jury to conclude Ettima understood the nature and quality of the killing and knew his act was morally and legally wrong.

## DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


IKOLA, J.